Filed 4/21/14  In re L.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.V., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E058946 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1200012) |
| v. | OPINION |
| M.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Edward Forstenzer, Judge.  (Retired judge of the Mono Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Pamela J. Walls, County Counsel, Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

For the second time, defendant and appellant M.V. (father) seeks intervention from this court to review the juvenile court's disposition order denying his request for placement of his daughter, L.V., in his care. In father's prior appeal (case No. E055794, filed Nov. 20, 2012 (E055794)), we reversed the dispositional order and remanded the case for a new disposition hearing for the purpose of considering and making findings regarding placement of L.V. with father under Welfare and Institutions Code section 361.2, subdivision (a).[1] At the June 10, 2013, remanded disposition hearing, the juvenile court ordered reunification services, but again denied father's request for placement because L.V. preferred to remain in foster care with her older half sibling and was emotionally aggressive towards father. Father appeals, contending: (1) the Riverside County Department of Public Social Services (Department) failed to provide him with reasonable services; (2) the Department erred in allowing L.V. to dictate visitation; and (3) the juvenile court erred in refusing to remove the social worker from the case on the grounds she had an agenda for L.V. to remain in long-term foster placement. Rejecting his claims, we affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

# I. PROCEDURAL BACKGROUND AND FACTS[2]

At the time this dependency case was filed, L.V. (born in 2002) was living with her mother and half sister, A.A. (born in 1998). Father never married mother and lived with her for a very short period of time. L.V. never lived with father. On December 2, 2011, the Department received a referral that mother was abusing alcohol and neglecting her daughters. Because mother had no place to live, the social worker took the children to the Indio Child Protective Services office and they were placed in protective custody. On January 11, 2012, the social worker contacted father, who expressed concern about immigration when the social worker mentioned going to the dependency court. He "declined to provide an address where he can be contacted, stating he has no job and no stable home." He stayed with friends and relatives.

On January 12, 2012, the Department filed a petition under section 300, subdivisions (b) and (g), alleging that mother had an unresolved history of alcohol abuse, had not maintained a stable and safe living environment for the children, and had failed to protect the children from sexual abuse from a maternal uncle. As for father, the petition alleged he had failed to provide for L.V. and neglected her health and safety by allowing her to continue to reside with mother despite knowledge of mother's alcohol use. On January 13, the court detained L.V. and authorized supervised visitation and reunification services for father.

---

[2] On July 11, 2013, on our own motion, we incorporated the record in case No. E055794 into the record in this case. We utilize the facts stated in our prior opinion (E055794) to provide a brief summary of the case from its inception through February 2012.

According to the jurisdiction/disposition report filed on February 1, 2012, father admitted being in the United States illegally, and thus "'is not able to easily find a job and pay child support for [L.V.].'" At the contested jurisdictional/dispositional hearing on February 29, 2012, L.V. testified that visits with father were "presently good" and she enjoyed them; however, he did not come and visit with her prior to the Department's involvement. When he had called mother's home, he would ask to speak to mother on the telephone. She acknowledged receiving some school clothes, shoes and a backpack from father. She explained that she did not want to live with him until they developed more of a father-daughter relationship because she is not comfortable with him. She also testified that she had never met father's wife.

Father admitted he never spoke with L.V. about the condition of mother's residence. He never asked L.V. whether she was hungry at mother's home and never brought food because he saw food in the refrigerator. Although he had paid no child support, he claimed that he took L.V. out for food every time they went out together. According to father, prior to the dependency proceedings, he saw his daughter "'on a special occasion . . . at least once a month . . . .'" He acknowledged the bond between L.V. and her half sibling because they had lived together their whole lives; however, he wanted custody of L.V. He explained that he had just reconciled with his wife, and L.V. could live with them.

After listening to father's argument, the court asked "if father really thought 'it would not be emotionally detrimental to [L.V.] to be placed with somebody—they both testified there is minimal relationship at best—without going through reunification

4

services that could allow them to build that relationship?'" The court concluded it was not in L.V.'s best interest to live with father until she became more comfortable and "they have developed 'a true father-daughter bond.'" Also, the court recognized L.V.'s bond with her half sister. Finding allegations (b)(1) through (b)(9) of the petition to be true by a preponderance of the evidence, the court removed L.V. from the physical custody of both parents under section 361, subdivision (c) and ordered family reunification services. Father appealed, and we ordered the juvenile court to conduct a new dispositional hearing for the purpose of considering and making findings as to father's request for placement of L.V. in his home pursuant to section 361.2.

On August 9, 2012, prior to this court's opinion, the six-month review report noted that father was living with his wife in Cathedral City. L.V. was described as a gentle child who cried during visits with her parents. The social worker recommended therapy so that L.V. would have a safe place to express her fears. L.V. was living with her half sister, A.A., and had adjusted to her foster home environment. If L.V. could not be reunited with her mother, she wanted to stay with her foster mother. While father was participating in counseling, he expressed frustration that L.V. was not willing to also participate in joint counseling or live with him. Father's visits with L.V. were supervised. During some of the visits, father behaved inappropriately with mother, "groping" her. He had a difficult time understanding his boundaries with L.V., touching her underarm hairs and acting as if he was going to breastfeed her. Many times, he paid more attention to mother than L.V. The visits improved; however, L.V. remained uncomfortable around father. She was adamant that she did not want to live with father.

5

On August 29, 2012, the court continued L.V. in her current placement and continued supervised visitation.

On February 1, 2013, the juvenile court ordered counseling for L.V. and conjoint counseling for L.V. and father. The 12-month status review report was filed on February 8, 2013. The social worker reported that on November 13, 2012, L.V. stated, "'My dad does not understand I just don't want to go live with him.'" On December 28, 2012, she was "adamant and said she will not live with her father." She refused to be alone with him, and her therapist recommended that everyone "support and validate" her feelings. In contrast, L.V. was attached to her caregiver and doing well in her home.

In the disposition report filed on February 22, 2013, the social worker recommended termination of reunification services to father and a permanent planned living arrangement for L.V. Father maintained his desire to have L.V. live with him. He criticized A.A.'s influence over L.V. and opined that A.A.'s friends are not good for L.V. L.V. informed the social worker that she had always shared a room with A.A.; they played games together, shared secrets, and helped each other out. As for father, L.V. had negative opinions about living with him, saying she did not like her dad but she loves her sister. She feared that father would hit her if she did something wrong, or that he would come into her bedroom without permission and do something wrong to her. According to A.A., L.V. "gets mad and doesn't like talking about him." The social worker opined that father was "not a consideration for placement of [L.V.] at this time." His relationship with his wife was not stable, he did not have steady employment, and he did not have a "healthy, loving father[-]daughter relationship with [L.V.]." Father continued to

6

participate in counseling; however, he refused to accept responsibility for what L.V. endured prior to the Department's involvement. A.A. was the only stable family member that L.V. had known since birth. The social worker opined that father did not understand what is involved in a healthy meaningful relationship, that L.V.'s feelings about her family life with A.A. and her foster family are genuine, and that to separate L.V. from the ones she loves would be cruel and detrimental to her emotional well being.

On March 6, 2013, at a continued hearing regarding disposition and review, father's counsel complained that L.V. had participated in only two private counseling sessions prior to the conjoint session because she did not want to participate. She blamed the Department for "cultivating an atmosphere to . . . permit this situation to go on where the child was being torn, not wanting to be reunited with the father. The court ordered individual and conjoint counseling.

In the addendum report filed on March 27, 2013, the social worker changed her recommendation to providing further reunification services for father, "as he will need more time to participate in conjoint therapy with [L.V.]." The social worker interviewed L.V., noting that she continued to maintain a strong bond with A.A. and a strong dislike of father. L.V. recalled a time when she was 7 or 8 and she was at home sick from school. Father came to visit mother and told L.V. to "get out of the bedroom." When she saw him unbuckle his belt, she got out of the bedroom. The social worker was concerned about father's relationship with mother and his current wife. Although he claimed to be living with his wife, he thwarted the social worker's attempts to speak with her or visit their home. The therapist opined that separating L.V. from her sister would be

7

detrimental to her emotional well-being. As for father, the social worker noted that he openly stated he was still in love with mother but left her because of her addiction. This contradicts his earlier claim that he did not know mother was drinking on a daily basis. The social worker continued to recommend that L.V. remain in foster care with her sister.

A further addendum report was filed on June 10, 2013. It was noted that father cancelled or failed to show up for his visits in April. He then stopped calling for visits. As for joint therapy, L.V. refused to communicate with father. As of May 2013, she remained adamant about not wanting to live with him. The therapist opined that father is giving up.

On June 10, 2013, the juvenile court conducted a contested disposition hearing pursuant to remand by this court. Father's counsel repeated her opinion that the Department made a "concerted effort to go out of [its] way to not place" L.V. with father. She complained the social worker chose not to follow the approved case plan by not putting L.V. in counseling. She claimed the description of father's behaviors during prior visits had been reported via the social worker's report for the sole purpose of justifying the Department's prior recommendation at the six-month review hearing. Father continued to request that L.V. be placed in his custody subject to family maintenance services.

While L.V. declined to speak in court, her attorney stated her wishes. L.V. wanted to stay with her sister and the foster family and not reunify with father. Although she was offered counseling, she refused to go. Counsel informed the court that L.V. was doing

8

everything in her power not to go with father, and thus, to place her with him would "cause chaos."

After considering the social worker's reports and listening to argument from all parties, the juvenile court found that it would be detrimental to place L.V. in father's custody; however, the court continued reunification services and counseling. The court based its decision on L.V.'s relationship with her sister and her aggression towards father. The court adopted the recommendation set forth by the Department as its findings and orders, which included 12 more months of reunification services. The court also denied father's oral motion to remove the social worker from the case.

## II. REUNIFICATION SERVICES

Father contends the juvenile court lacked sufficient evidence to order L.V. removed from his care because the Department failed to provide him with reasonable family reunification services. Father's sole complaint is that the Department "did not act in good faith to assist [him] with improving his relationship with [L.V.] but instead implemented the goal for [L.V.] to remain in foster care with her sister." We disagree.

### A. Applicable Law

"'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Reunification services are typically understood as a benefit provided to parents, because

9

services enable them to demonstrate parental fitness and so regain custody of their dependent children. [Citation.]" (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)

The Department is required to make a good faith effort to provide reasonable services responsive to the unique needs of each family. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.) The adequacy of reunification plans and the reasonableness of the Department's efforts are judged according to the circumstances of each case. (*Ibid.*) The burden is on the Department to show the reunification services provided to a parent were reasonable. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).)

A juvenile court's finding that reasonable reunification services have been offered and provided to the parents is reviewed under the substantial evidence standard. (See *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.) The reviewing court "'construe[s] all reasonable inferences in favor of the juvenile court's findings regarding the adequacy of reunification plans and the reasonableness of [the Department's] efforts.' [Citation.]" (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.) "If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed. [Citations.]" (*Misako R.*, *supra*, 2 Cal.App.4th at p. 545.)

**B. Analysis**

Here, substantial evidence demonstrates the Department made a good faith effort to provide reunification services to father, and that the services were reasonable under the

10

circumstances. While father attempts to attribute L.V.'s strong lack of interest in developing a relationship with him on the Department's failure to force her into both individual and conjoint counseling, the record shows otherwise. Since L.V. was born, father showed little to no interest in developing a parental relationship with her. He never lived with L.V. and mother. He would call and only want to speak to mother; and when he visited, it was only with mother, and in her bedroom. He provided little financial support. When mother lost custody of L.V. and father and mother would visit, he seemed more interested in "groping" mother than visiting L.V. Regarding father's living arrangements, he claimed to be back with his wife and working on their issues; however, he thwarted the social worker's attempts to gain access to his home or speak with his wife. Father offered the paternal grandmother's home as a place where L.V. could live until she was ready to live with him. The social worker was justified in her concern that father did not have a permanent place to call home.[3]

Regarding services, we note that jurisdiction was established on February 29, 2012, and reunification services were ordered. In May, L.V. was referred to therapy and father was referred to parenting classes. In July and September, the social worker inquired as to whether L.V. would participate in therapy and encouraged her to do so. By November, L.V. agreed to counseling and later began participating in individual

---

[3] This fact alone distinguishes this case from *In re Patrick S.* (2013) 218 Cal.App.4th 1254, which father cites in his reply brief. Unlike here, the father in *Patrick S.* had not been part of his son's life because his mother had moved him from state to state, not maintaining contact with the father, who had searched for them. (*Id.* at pp. 1256-1257.) The father served in the United States Navy, paid child support through the court, and maintained medical and dental coverage for his son. (*Id.* at p. 1257.) The father was described as a competent, caring and stable parent. (*Id.* at p. 1263.)

11

counseling. In January 2013, L.V.'s therapist opined that conjoint counseling was not appropriate immediately but expected to begin these sessions the next month. Conjoint counseling began in February; however, it was not successful. L.V.'s therapist reported that L.V. was angry. By April 2013, father was not interested in participating in either conjoint counseling or visitation. L.V. refused to connect with father on any level.

Pursuant to section 361.2, subdivision (a), the court must place a child with a noncustodial parent "*unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.*" (Italics added.) A juvenile court's determination under section 361.2, subdivision (a) not to place a child with a noncustodial parent requires a finding of detriment by clear and convincing evidence. (*In re Marquis D*. (1995) 38 Cal.App.4th 1813, 1827; *In re Luke M*. (2003) 107 Cal.App.4th 1412, 1426.) "We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that . . . the child[] would suffer such detriment. [Citations.]" (*In re Luke M.*, *supra*, at p. 1426.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings. [Citation.]" (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) The focus is on the best interest of the child, not on the conduct of the parent: "[A]lthough a jurisdictional finding is predicated on parental conduct, a detriment finding for purposes of deciding placement with a noncustodial, nonoffending parent need not be." (*In re Luke M.*, *supra*, at p. 1425.)

12

Here, substantial evidence shows that placement of L.V. with father would have been detrimental to her emotional well-being. Father's failure to be a part of L.V.'s life, coupled with his inappropriate actions towards her when he was, make it easy to understand why L.V. did not trust him or want to be around him. The social worker is not to be blamed for L.V.'s feelings; nor is it reasonable to assume that intensive counseling could have eliminated them overnight. The social worker did exactly what she was required to do, i.e., she encouraged L.V. to participate in individual counsel, a necessary condition before conjoint therapy could begin. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973.) We are mindful that for the first nine years of L.V.'s life, father failed to provide her with the love and affection she needed. To expect that a few months of counseling would result in her turning to father for a home and protection is unrealistic. Even L.V.'s therapist was of the opinion that conjoint counseling was not appropriate immediately. All things considered, the services provided to father were reasonable under the circumstances. (*Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)

We reject father's claim that he was not provided with reasonable reunification services. However, even if the Department were deficient in providing services, the remedy would not be to place L.V. with father, but to offer further reunification services. "The purpose of child dependency proceedings is to serve the child's best interests, not to dispense punishment. [Citation.]" (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 975.) That is what the juvenile court did. It ordered services be continued for another 12 months, including conjoint counseling. Thus, father was given another year to form a relationship with L.V.

13

## III.  REASONABLE VISITATION

Father faults the Department for "impermissibly allow[ing L.V.] to control the terms of visits, discourag[ing] visitation, and enabl[ing L.V.] to refuse visitation to the point where visits stopped due to her reluctance."

Section 362.1, subdivision (a)(1)(A) provides that "any order placing a child in foster care, and ordering reunification services, shall provide . . .  [¶] . . . for visitation between the parent or guardian and the child.  Visitation shall be as frequent as possible, *consistent with the well-being of the child*."  (Italics added.)  "While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.'  [Citation.]  This includes the 'possibility of adverse psychological consequences of an unwanted visit between [father] and child.'  [Citation.]"  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50 (*Julie M.*).)  "[T]he court may appropriately rely upon an evaluation by treating therapists of the children's emotional condition and evolving needs.  [Citation.]"  (*Id.* at p. 51.)

Here, supervised visitation was ordered, and the Department facilitated such visitation.  Neither the court nor the Department delegated the decision about visitation to L.V.  However, L.V. strongly resisted participating in any visitation with father.  While father relies upon *Julie M.* and other cases in support of his contention, we note those cases are distinguishable.  In *Julie M.*, the juvenile court gave the subject children "the option to consent to, or refuse, any future visits with their mother."  (*Julie M.*, *supra*, 69 Cal.App.4th at p. 46.)  The appellate court concluded that the juvenile court abused its

14

discretion "in giving the children *absolute discretion* to decide whether [the mother] could visit with them. The order essentially delegated judicial power to the children . . . ." (*Id*. at pp. 48-49, italics added; See also *In re S.H.* (2003) 111 Cal.App.4th 310, 317-319 [the child's wishes may not be the sole factor in determining whether any visitation takes place].) Here, visitation between L.V. and father was scheduled and L.V. attended. However, no one could force her to act in a particular way once the visits began. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1358.)

IV. REQUEST FOR REMOVAL OF SOCIAL WORKER

In his final claim, father contends the juvenile court erred in failing to remove the social worker from this case.

Section 16513.5 provides: "Any party to a dependency proceeding may bring a motion before the juvenile court to have a social worker removed from the case. The juvenile court judge in the dependency proceeding shall grant the motion if a preponderance of evidence shows that a conflict of interest has occurred that would interfere with the social worker's ability to objectively carry out his or her duties, which may include, but is not limited to, any of the following: [¶] (a) The social worker has had sexual contact, as defined in Section 43.93 of the Civil Code, with any party to the dependency proceedings. [¶] (b) The social worker has a relationship with an individual who is adopting or attempting to adopt a child who is the subject of the pending dependency proceeding, and the relationship is of such a nature that a conflict of interest or bias may exist on the part of the social worker which may compromise his or her

15

objectivity. [¶] (c) The social worker has been convicted of perjury with regard to the dependency proceeding before the court."

While a juvenile court is statutorily empowered to remove a social worker from a case, it should not do so lightly and only under very limited circumstances. "In providing child welfare services, the county's social services agency acts as an administrative agency of the executive branch, subject to supervision by the State Department of Social Services. [Citations.]" (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7.) "The determination of how best to assign duties to employees and otherwise allocate the agency's resources is not a judicial function and must be left to the agency's own discretion." (*Id.* at p. 9.) "As a matter of public policy and under the doctrine of separation of powers, designation of the social worker to perform the tasks of the social services agency must be left to the discretion and expertise of the [the agency's] director." (*Id.* at p. 10.) In the absence of an actual conflict of interest, the juvenile court has no jurisdiction to remove a social worker from a case when the social services agency has not seen fit to do so.

There are no allegations of any actual conflicts of interest here. Rather, father asserts the social worker "refused to follow the court ordered case plan, and demonstrated a lack of objectivity regarding the goal of reunification." But there is no evidence in the record to support this assertion. From the inception of this case, both father and L.V. acknowledged that they had no relationship; however, L.V. appeared willing to participate in visitation to get to know him. Nothing in the record shows the social workers interfering with the goal of reunification; rather, father's own actions disrupted

16

reunification. During the first six months of visitation, it appeared that father was more interested in seeing mother than L.V. Further, father was critical of A.A., the only family member L.V. was strongly bonded to.

As the Department points out, another social worker on the case observed that father did not know how to build a healthy relationship with L.V. Instead, father was more concerned with his wants than her best interests. As the reports of visitation and father's behavior show, such observation was accurate. Instead of trying to find a place for himself in L.V.'s world, he wanted to force her to leave the comfort and security of her world to become part of his. The more he attempted to do this, the more she pulled away. When L.V. was not progressing in conjoint counseling, father decided to stop participating. He further exacerbated the problem by refusing to visit with her. Despite father's actions, the social worker encouraged L.V. to participate in visitation and therapy. Nonetheless, father sought to lay blame entirely on the social worker, and thus, requested that she be removed. We agree with the trial court that this request is unwarranted.

## V. DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

MILLER
J.